IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE REAL PROPERTY AND PREMISES KNOWN AS 5015 SENTINEL DRIVE APT. 82, BETHESDA, MARYLAND 20816 (AS MORE SPECIFICALLY DESCRIBED IN ATTACHMENT "A") | Case No. 15 - 1566 LSC |

_____FILED  _____ENTERED
_____LODGED  _____RECEIVED

SEP 1 7 2015

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____DEPUTY

Under Seal

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION FOR A WARRANT TO SEARCH AND SEIZE**

I, Chad Laub, Special Agent with the United States Secret Service, being duly sworn, state:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I have been employed as a Special Agent with the United States Secret Service since 1998. In that capacity I investigate violations of federal statutes concerning access device fraud, bank fraud, wire fraud, false identification, identity theft, and counterfeiting of United States currency. I am presently assigned to the Washington Field Office.

2.     Before working for the Secret Service I was employed as an Atlanta Police Officer from 1988 to 1998. I was formally trained in 1998 as a Criminal Investigator at the Federal Law Enforcement Training Center in Glynco, Georgia and as a Special Agent at the USSS's James J. Rowley Training Center in Beltsville, Maryland. My training included general law enforcement and criminal investigations, including financial investigations and counterfeiting.

3.     This affidavit is submitted under Rule 41 of the Federal Rules of Criminal Procedure in support of an application for a warrant to search 5015 Sentinel Drive, Apartment 82, Bethesda, Maryland 20816, the residence of Mathew Bailey HASH (collectively, the "**Subject Residence**"), as more particularly described in Attachment A.

1

LSC
9/1/15   CL

4.     As explained in more detail below, I submit that there is probable cause to believe that within the **Subject Residence** and the curtilage of the **Subject Residence** evidence will be found of violations of federal laws; specifically, access device fraud, in violation of 18 U.S.C. § 1029 and conspiracy to commit wire fraud, in violation of Title 18, United States Code, Sections § 1343 and § 1349.

5.     This affidavit is based on my personal investigation and the investigation of others, including federal and local law enforcement officials whom I know to be reliable. The facts and information contained in this affidavit are based upon witness and suspect interviews and my review of records, documents, and other physical evidence obtained during this investigation. This affidavit does not include each and every fact known to the government, but only those facts necessary to support a finding of probable cause to support the requested warrant.

## BACKGROUND OF INVESTIGATION

### Overview

6.     In and around 2015, a joint investigation began between the Montgomery County Police Department ("MCPD"), and the United States Secret Service ("USSS") into the unauthorized use of "gift card account numbers" (hereafter, gift cards) to purchase items, through the use of interstate wire transmissions, to obtain numerous items, including additional gift cards from TJX Companies Inc. ("TJX') consisting of TJ Maxx, Marshalls, Home Goods stores in numerous states including Virginia and Maryland. TJX are stores specializing in the sale of consumer apparel, jewelry, and home goods.

7.     Prior to the involvement of law enforcement, TJX began to notice an increase of customer complaints that the TJX gift cards with monetary value that were issued to them no

2

longer had any value even though the customer had not used the monetary credit on the gift cards.

8.     For several months, Loss Prevention for TJX Company had been investigating the fraudulent usage of gift cards. The scam generally involves subjects using re-encoded or cloned gift cards to purchase items at one of the three stores that are associated with the TJX Company such as Marshalls, TJ Maxx, or Home Goods.

9.     By way of background, each gift card issued by TJX Company has a unique number that is reflected in both the (a) physical number printed on the card, and (b) the electronic number scanned onto the card. On legitimate TJX gift cards, the physical number and the electronic number match. TJX maintains records concerning its gift cards on an internal electronic database, known as a Stored Value Card or SVC portal.

10.    The gift cards being used in the scam are cloned or duplicate gift cards, that is, they have been re-encoded with stolen electronic numbers. The electronic numbers have been stolen through unknown means. Therefore, the electronic numbers scanned onto the re-encoded or cloned gift cards do not match the physical numbers printed on the card.

11.    The scheme is fulfilled by the subjects returning merchandise that was purchased with a re-encoded or cloned gift card and obtaining a new "clean" gift card, whereby the numbers printed on the card match the numbers encoded on the card.

12.    TJX investigation discovered that many of the re-encoded or cloned gift cards were high-value dollar cards and most of the original gift cards had been issued to customers out of the Northeast area of the United States. Through investigation suspects were identified. A primary suspect is named Matthew Bailey HASH ("HASH"), who resides in Montgomery County, Maryland. According to NCIC, HASH was convicted of armed robbery in Hyattsville,

3

9/1/15

Maryland, in 2011, and was sentenced to 15 years in state prison, with 11 years suspended. HASH was released on parole in 2013. Another primary suspect is named JARROD GRAY ("GRAY"), who resides in Prince William County, Virginia. GRAY is an internal Loss Prevention Officer of TJX whose current duties include doing internal fraud investigations of TJX employees in Northern Virginia and West Virginia.

<u>Suspected Transactions by Matthew HASH</u>

13.     On January 4, 2015, HASH entered Marshalls (store 209) located 12059 Rockville Pike, Rockville, Maryland, 20852. He purchased three pairs of high end designer shoes for $922.17 using multiple gift cards, including a gift card with the number ending in 8430. HASH then left the store with the merchandise. The card ending in 8430 was generated in Kingston, New York on September 11, 2014. The card owner's assistant confirmed that the card was compromised, they were reimbursed and they did not go to Maryland to make any purchases. TJX reimbursed the card and suffered a loss.

14.     On January 24, 2015, a subject believed to be HASH entered Marshalls 548 located at 46262 Cranston Street, Space C-4, Sterling, Virginia 20165. The subject made two purchases: first transaction was one pair of shoes and for two $100.00 gift cards; the second transaction was for two $125.00 gift cards totaling $250.00. He used one gift card ending in 2964 to purchase the items for $491.34. The subject then left the store with the gift card and the merchandise. On February 3, 2015, the TJX Company received a customer complaint in regards to missing funds on gift card ending with 2964. The customer claimed to have not authorized the purchases made on January 24, 2015 in Loudoun County and the TJX companies was obligated to reimburse the customer. Overall loss to the company totaled $491.34.

4

lsc
9/1/15 cc

15.     On March 20, 2015, Loss Prevention from TJX Company was conducting surveillance on the TJ Maxx located at 18329 Village Mart Drive, Olney, Maryland due to the multiple breaches in gift cards. They observed a suspect identified here as "Suspect One" enter the store. Suspect One is a known subject because he had conducted non-receipted returned items in the store where he had to provide identification. Suspect One conducted a sale using cloned gift cards. After completing the sale, he got into a Toyota Corolla with Maryland license plate 3ELW02. A query of the Maryland Motor Vehicle Administration (MVA) was conducted license plate 3ELW02 reveals it is registered to a Stephen HASH, date of birth of December 12, 1945, at the Subject Premises. According to a public source database, Matthew HASH is believed to be related to Stephen HASH[1].

16.     Later on March 20, 2015, Loss Prevention went to 13205 Superior Street, Rockville, Maryland 20853 and observed the Toyota Corolla with Maryland license plate 3ELW02. A query of the Maryland MVA was conducted and Detective Vendemio obtained a known photograph of Suspect One and compared it to the still photographs taken at the TJ Maxx in Olney, Maryland, from March 20, 2015 and determined them to be the same person.

17.     Detective Jim Cherry, MCPD, observed the videos associated with the multiple gift card transactions described above. He compared the video to a mugshot of Matthew HASH and determined them to be the same person.

### The April 30, 2015 Search of Matthew HASH's Prior Residence

---

[1] According to a law enforcement database, Stephen HASH is the registered owner of a handgun at the SUBJECT PREMISES.

GC
9/1/15

18.     Detective Vendemio, MCPD, conducted a query of a law enforcement database and discovered that on November 12, 2014, HASH called the police in reference of one of his roommates who was feeling suicidal. The address where the Police and Fire Rescue responded was the Oxford House, located at 13205 Superior Street, Rockville, Maryland 20853. Upon information and belief, the Oxford House is an association of "half-way" houses which provide low-rent housing for convicted felons currently on parole or probation as they transition from incarceration back into the local communities. On February 27, 2015, Montgomery County Police Officer Amaya observed Matthew HASH at the Oxford House at 13205 Superior Street Rockville, Maryland 20853. In March of 2015, TJX Loss Prevention Officer Dustin Blue observed Matthew HASH both leaving and entering the Oxford House at 13205 Superior Street, Rockville, Maryland 20853.

19.     On April 30, 2015 a search and seizure warrant was executed by Montgomery County Police Department (MCPD) at HASH's residence at 13205 Superior Street, Rockville, Maryland 20853. A credit card encoder and multiple gift cards were seized, as well as an Apple iPhone related to the phone number (240) 477-0669. Located on the phone carrying number (240) 477-0669 were multiple photos and videos of HASH, as well as multiple links to social media site accounts held by HASH.

20.     MCPD officers found numerous TJX gift cards at HASH's residence at the Oxford House. TJX investigators identified that 77 TJX gift cards were re-encoded or cloned with unauthorized gift card account numbers that did not match the printed gift card account number on the gift cards. In addition, receipts were found that matched purchases made through the fraudulent use of cloned and valid TJX gift cards by HASH and Suspect One.

LC
9/1/15 cc

21.     Following the execution of the search warrant noted above, Montgomery County Police

Detective J.M. Cherry subpoenaed phone records from Sprint for (703) 855-4031.  According to

TJ Maxx, this is GRAY's personal cellphone number that he uses for work purposes and for

which he submits his bill to receive reimbursement from TJX for business-related calls.

According to Sprint records, GRAY's cellphone has been in regular contact with Matthew

HASH between May 1, 2015 and June 9, 2015 (after the execution of the state search warrant)

which indicates their on-going communication. Prior to the search warrant on April 30, 2015,

Matthew HASH's Sprint cell phone records displayed 45 phone calls between HASH and GRAY

from December 3, 2014 and April 4, 2015.

22.     Further, Investigator Blue of TJX has provided internal data from TJX to illustrate that

GRAY has been accessing the TJX internal gift card database (SVC portal) on a weekly basis

over the past year.  TJX investigators found that GRAY and his supervisor have been the only

two TJX employees that have been using this database on a weekly basis over the past year.

According to TJX, GRAY has the ability to access to this database but is only authorized to do

so if it is related to an authorized internal fraud investigation.  TJX has advised that over the past

year, GRAY did not have an authorized fraud investigation which would have authorized him to

access the TJX gift card database (SVC portal).

### The Analysis of Communications Between HASH and GRAY

23.     Pursuant to the April 30, 2015, search and seizure warrant at HASH's former residence,

Detective Hart analyzed the phone belonging to HASH and the below messages were recovered.

The messages were between HASH and a contact noted in HASH's cell phone as "Superfly (Gift

Card)".  The phone number for "Superfly (Gift Card)" is listed as (703) 855-4031. The Sprint

phone bill for (703) 855-4031 has the subscriber name of JARROD S. GRAY and the address of

9/1/15 cc

4490 Dale Blvd. Woodbridge, Virginia 2219-2534. GRAY also lists this number as a contact number on his TJX personnel forms.

24.     The below communication is a MMS (Multimedia Messaging Service) recently reviewed which was recovered from the cellular phone belonging to HASH pursuant to a search and seizure warrant. The message was sent on December 16, 2014 to a contact noted in HASH's cell phone as "Superfly (Gift Card), i.e., GRAY, in the contact list located on the cell phone. "Yeah sent him in with 4 coupons all labeled & numbered. He said there was little to none on most of them and that the combined total was $400 or so. He said the clerk combined all the cards onto one card and then cut all the cards in half. I completely flipped on him but he's adamant that nobody suspected anything and that he's telling me the truth.. I just got to make sure because on top it all, this is the very first time I've given him coupons without already knowing the amount on them.. The deck today has been on point so for him to come out with this story and no receipts is just hard to swallow."

25.     The following listed Short Message Service (SMS) messages were also recovered from the cell phone owned by HASH pursuant to a search and seizure warrant. On December 16, 2014 the following message was sent from GRAY to HASH's phone: "Word is, images are being collected form [sic] Maryland area. Trying to identify the members of the book club." In October of 2014 TJ Maxx Investigators started a fraud investigation on a group of subjects in Maryland and Virginia using cloned TJ Maxx gift cards. GRAY was alerted to the investigation by TJX Investigator Blue.

26.     On January 14, 2015 the following message was sent from HASH's phone to GRAY: "We might have an issue the first 3 cards came up invalid b 4 one worked.!! Like they were written wrong maybe." During the execution of a search warrant of HASH's residence,

8

ᏏᏟ
9/1/15ᏟᏟ

duplicate or cloned TJ Max gift cards were discovered in HASH's bedroom. A duplicate or cloned card would become invalid if the legitimate owner of the card uses the monetary value on the card before the cloned or duplicate card can be used.

27.     On January 25, 2015 the following message was sent from HASH's phone to GRAY: "My brokerage just lowered the rate on books 2 full points.. Started in on the 20th without my knowledge. Not much I can do about it but complain. I think it's funny myself that there's been a full 2 point fall. Regardless where good tomorrow." Law enforcement is aware that HASH is selling gift cards over the internet to several brokers that trade gift cards as a commodity. A broker such as Cardcash.com pays a seller, such as HASH, a percentage of the value of the gift card. The rates fluctuate like any other type of commodity.

28.     On January 26, 2015, the following message was sent from HASH's phone to GRAY: "Hey is one of the P.I. security people named Kenny?" In November of 2014, TJX personnel started surveillance of a group of individuals engaged in fraudulent use of gift cards. "P.I." is a commonly used term for a private investigator. GRAY responded to HASH, stating: "Not sure. I only know the two from that area dustin and Eric. There my be one from another area." Dustin Blue and Eric Block are investigators employed as loss prevention agents for TJX. Blue and Block are responsible for the investigating the fraudulent use of gift cards in this case. It is a violation of TJX policy for an investigator of TJX, like GRAY, to provide any information on a current investigator or the identity of TJX investigator without authorization, especially to a subject of an investigation, like HASH.

29.     On January 27, 2015 the following message was sent from GRAY to HASH's phone: "I'll be a home. 4490 Dale Blvd. Woodbridge 22193. Just shoot me a text and I will come out." This address is listed as JARROD GRAY's in TJX employee records and confirmed by

9

surveillance conducted by TJX investigators. On the same date, HASH responded: "Ok sounds good."

30.    On February 17, 2015 the following message was sent from HASH's phone to GRAY: "Looks like I'm not even gonna make it outta town. How hot is NOVA right now?" Northern Virginia can be abbreviated as NOVA. "Hot" is a common term used by criminals to describe law enforcement presence. GRAY responded: "I have not heard anything about them watching that area. That's not even a BOLO as far as I have heard." BOLO is an acronym used by police and loss prevention that means "Be On the Lookout."

31.    On February 27, 2015, the following message was sent from HASH's phone to GRAY: "I'll be ready Sunday." On that date, February 27, 2015, the TJX system log reports for GRAY show that he was logged into the Store Value Card (SVC) Portal, which is an electronic repository for TJX SVC gift card data (also known as the TJX gift card database).

32.    On March 1, 2015 the following message was sent from HASH's phone to GRAY: "What time were thinking tonight.?"

33.    On March 2, 2015, the following message was sent from HASH's phone to GRAY: "U can come around." The TJX system log reports for GRAY show that he was logged into the SVC Portal (the TJX gift card database) on March 2, 2015.

34.    That same day, on March 2, 2015, the following message was sent from HASH's phone to Suspect One: "I have new cards. You wanna gets some work done?"

35.    On March 6 2014, Suspect One entered Marshalls 482 located at 1356 Franklin Mills Circle, Philadelphia, Pennsylvania, 19154. Suspect One made a purchase with two cloned or duplicate gift cards ending in numbers 3141 and 0848. He purchased two men's items for

$84.98 and two $300.00 Store Valued Cards ending in 0228 and 0236. The sale totaled $684.98. The two cards presented for payment were later determined to be fraudulent.

36.     On March 9, 2015, the following message was sent from HASH's phone to GRAY: "I'll be ready for you tomorrow. Not sure what your schedule is looking like so keep me posted." The same day, GRAY responded: "Okay." The TJX system log shows that GRAY logged into the SVC Portal (the TJX gift card database) on March 9, 2015.

37.     Following this conversation, from March 13, 2015 to at least March 20, 2015, HASH and Suspect One used multiple gift cards to purchase merchandise worth thousands of dollars at TJX stores in Virginia and Maryland. TJX has already determined that at least one of the gift cards used by Suspect One during these transactions contained stolen gift card credits.

38.     On April 29, 2015 the following message was sent from GRAY to HASH: "Okay. I have to leave town so it will have to be Friday night." On same date, the following message was sent from HASH to GRAY: "I'm for sure ready tomorrow. I was ready today but I have a real long back log of business that I'm dealing with now. How much canvas will you need.? Same as usual.?" "Canvas" is believed to be a reference to how many fraudulent cards or card numbers HASH would need.

39.     On April 30, 2015 the following message was sent from HASH to GRAY: "I owe you another $398 that should bring the total to $4558".

40.     On May 19, 2015, the Fairfax County Police arrested HASH for larceny, credit card fraud and credit card forgery stemming from his fraudulent use of gift cards at TJX stores in northern Virginia. HASH was subsequently released on bond.

## PROBABLE CAUSE

### Additional Fraudulent Transactions by HASH since April 30, 2015

41.     As set forth above in paragraph 21, GRAY and HASH continued to communicate with each other even after the April 30, 2015, search warrant at HASH's residence.  Between June 20 and June 23, 2015, HASH and his co-conspirators were observed on TJX store surveillance video using cloned or duplicate gift cards (i.e., issued to other customers) making transactions at least 30 different TJX stores in New Jersey, Pennsylvania and Delaware.  According to TJX, the loss amount for these fraudulent transactions over this three day period was a little over $12,000.  HASH"s fraudulent activity has continued.

42.     On July 2, 2015, at 2:11 pm, HASH entered a TJ Maxx (Store 716) located at 1776 E. Jefferson Street, Montgomery County, Maryland 20852.  HASH made a balance inquiry at register 50.  He made multiple inquiries at this register with cards ending in 6896 and 9173.  The card ending in 6896 had a balance of zero and was originally issued in Newton, Massachusetts on May, 18, 2015 for $800.00.  The card ending in 9173 was originally issued to a customer in Newton, Massachusetts on June 23, 2015 for $799.38.

43.     At approximately 5:07 on July 2, 2015, HASH entered the Marshalls store (1277) located at 5333 Wisconsin Ave. NW, Washington, D.C.  HASH made a purchase at register 8, for a hat for$12.99 and a men's tie for $19.99.  He used one gift card to purchase the items with an account ending in 4360.  HASH then left the store with the gift card and the merchandise.  The gift card ending in 4360 was originally issued to a customer in Sommerville, Massachusetts on April, 8, 2015 who was not HASH.

44.     At approximately 5:07 pm, on July 2, 2015, an unknown black male subject entered the same Marshalls (1277) located at 5333 Wisconsin Ave. NW, Washington, D.C.  The black male

9/1/15  CC

subject made a purchase at register 5, for gift card for $200.00. He used one gift card to purchase the item with the account number ending in 4360 – the same account number associated with the gift card used by HASH and described above. In addition, this gift card also was originally issued to a customer in Sommerville, Massachusetts on April 8, 2015 who was not HASH. The unknown subject then left the store with the gift card and the merchandise.

45.     Later, at 5:55 pm, on July 2, 2015, the same unknown black male subject used the gift card ending in 9173 (described in paragraph 42 above) to purchase a watch in the TJ Maxx (Store 135) located at 5300 Wisconsin Ave, NW, Washington D.C. The purchase of $740.29 was deducted from the gift card ending in 9173, leaving a balance of $59.09. At 6:08 pm, approximately 10 minutes after this purchase, HASH entered this store.

46.     According to TJX, the loss amount attributable to HASH and his co-conspirators from the fraudulent use of cloned or duplicate gift cards from September 2014 through July 15, 2015, is in excess of $300,000.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

47.     After the April 30, 2015, search warrant at the Oxford House, HASH moved out and into a new residence. According to the Maryland MVA, HASH has a listed address of 5015 Sentinel Drive, Apartment 82, Bethesda, Maryland 20816 (the SUBJECT RESIDENCE).

48.     On August 25, 2015, Det. Cherry of the Montgomery County, Maryland Police Department observed HASH leave the SUBJECT RESIDENCE and enter a Toyota Corolla with Maryland license plate 3ELW02. It should be noted that MVA records reveal that HASH's driver's license is suspended.

49.     Based upon my experience, training, and the information above, I know that persons involved in crimes using computer systems and networks will access them from both their

mobile devices and home computers and will keep other records of their activities. I am also aware that this type of information is commonly stored at their place of residence or in vehicles on the curtilage of their residence and can also be in the form of paper documents or electronic files, either on a computer or on electronic storage media and devices which include smart cards, gift cards and PIV cards.

50.       Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the internet are automatically downloaded into a temporary internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

51.   Based upon my knowledge, training and experience, I know that searching and seizing

information from computers often requires agents to seize most or all electronic storage devices

(along with related peripherals) to be searched later by a qualified computer expert in a

laboratory or other controlled environment.  This is often necessary to ensure the accuracy and

completeness of such data, and to prevent the loss of the data either from accidental or

intentional destruction. Additionally, to properly examine those storage devices in a laboratory

setting, it is often necessary that some computer equipment, peripherals, instructions, and

software be seized and examined in the laboratory setting. This is true because of the following:

a.      **The volume of evidence:**  Computer storage devices (like hard disks, diskettes, tapes,

laser disks) can store the equivalent of millions of pieces of information. Additionally, a suspect

may try to conceal criminal evidence; he or she might store it in random order with deceptive file

names.  This may require searching authorities to examine all the stored data to determine which

particular files are evidence or instrumentalities of crime.  This sorting process can take weeks or

months, depending on the volume of data stored, and it would be impractical and invasive to

attempt this kind of data search on-site.

b.      **Technical Requirements:**  Searching computer systems for criminal evidence is highly

technical process requiring expert skill and a properly controlled environment.  The vast array of

computer hardware and software available requires even computer experts to specialize in some

systems and applications, so it is difficult to know before a search which expert is qualified to

analyze the system and its data.  In any event, however, data search protocols are exacting

scientific procedures designed to protect the integrity of the evidence and to recover even

"hidden," erased, compressed, password-protected, or encrypted files.  Because computer

evidence is vulnerable to inadvertent or intentional modification or destruction (either from

external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

## CONCLUSION

52.     Based on the foregoing, I submit that there is probable cause to believe that the **SUBJECT RESIDENCE**, will contain evidence of, and constitute instrumentalities and fruits of, crimes including access device fraud, in violation of Title 18, United States Code, Section 1029, and conspiracy to commit conspiracy to commit wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1349.

16

LSC
9/1/15 cc

53.     I therefore respectfully request the issuance of a search warrant authorizing the search the

of **SUBJECT RESIDENCE** any enclosed and secure areas accessible to residents, and any

automobiles associated with the residents if such automobiles be found on the property or on the

curtilage, and to open any closed containers or other closed items found therein (including any

locked containers, encrypted computer files, or other computer files found there) and to seize any

items set forth in Attachment B.


_____

Special Agent Chad M. Laub
United States Secret Service


Sworn to and subscribed before me
this ___ day of September, 2015.


_____
William Connelly
Chief United States Magistrate Judge

## ATTACHMENT A

The property to be searched is described as 5015 Sentinel Drive, Apartment 82, Bethesda, Maryland 20816, and is further described as: a condominium ("condo") in a two-story condo complex. The two-story complex is a light red brick building and condo # 82 is on the second floor. There is a large window to the right of the front door. The front door has a glass storm door with white trim. The front door is dark in color and is located on the corner of the condo and is accessed through the common stair area of the condo complex. There is a brass door knocker in the center of the door near the top. The number 82 is white in color with a dark background displayed on the center of the door knocker.

LDC
9/1/15 cc

## ATTACHMENT B - ITEMS TO BE SEIZED

1. Indicia of counterfeit or unauthorized access devices, including:
   a. any counterfeit or unauthorized access devices, counterfeit access device-making equipment, or instrumentalities of the same;
   b. gift cards or any other genuine access device;
   c. any card with a magnetic stripe.

2. Magnetic stripe reading or writing equipment;

3. Cash, but only if the cash in the aggregate exceeds $500;

4. All records relating to violations of the statutes listed on the warrant including:
   a. unauthorized access devices or wire fraud;
   b. lists of genuine cardholders and related identifying information; account numbers, personally identifiable information such as addresses or telephone numbers;
   c. any information related to sources of stolen credit card numbers or gift card numbers/cards (including names, addresses, phone numbers, or any other identifying information);
   d. any information recording HASH's schedule or travel, including a GPS device or GPS tracking of any kind;
   e. all bank records, checks, credit card bills, account information, transaction records, receipts and other financial records.

5. Any computers, any electronic devices including phones, tablets, electronic storage devices, or electronic media and that were or may have been used to facilitate the commission of access device fraud in violation of 18 U.S.C. § 1029 or conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, or may contain evidence of access device fraud.

6. For any computer hard drive or other electronic storage media (hereinafter, "MEDIA") that is called for by this warrant, or that might contain things otherwise called for by this warrant:
   a. evidence of user attribution showing who used or owned the MEDIA at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;
   b. passwords, encryption keys, and other access devices that may be necessary to access the MEDIA;
   c. documentation and manuals that may be necessary to access the MEDIA or to conduct a forensic examination of the MEDIA;
   d. evidence of the times the MEDIA was used.

7. Records and things evidencing the use of the Internet including:
   a. routers, modems, and network equipment used to connect computers to the Internet;
   b. records of Internet Protocol addresses used by the MEDIA;


9/1/15 cc

8. Financial records and other records or documents reflecting access device fraud activity or the disposition of proceeds of any specified unlawful activity including, but not limited to, the following:

    a. retained copies of federal, state, and local excise, corporate, partnership, business, and personal income tax returns; Forms W-2; Forms 1099; tax records; any supporting documentation and attachments; and any correspondence to/from taxing agencies;

    b. notes of financial transactions;

    c. correspondence, including electronic mail transmissions, letters, faxes, and notes, relating to financial transactions, including the identification of customers, suppliers, associates, partners and co-conspirators;

    d. bank records, including deposit slips, cancelled checks, withdrawal slips, and account statements, investment records, including brokerage statements, and credit and debit card records;

    e. currency, bank checks, cashiers checks, negotiable financial instruments, wire transfer documentation, money orders, stocks, bonds, precious metals, and real estate records; and/or work sheets ,tally sheets or ledger sheets reflecting or accounting for money received, disbursed or exchanged.

    f. financial statements, income statements, balance sheets, cash receipts, cash disbursements, payroll, inventory, manufacturing records and journals and records; and any supporting work papers, schedules, attachments or documents;

    g. bills and invoices, including sales, purchases and expenses;

    h. records of financial payments paid and received;

    i. mortgage or loan records payable or receivable and insurance records;

    j. deeds, titles or other proof of ownership of property;

    k. records and keys of storage facilities owned or rented;

    l. records of business filings or licenses and minutes of meetings;

    m. records of personal and business expenses;

    n. safe deposit records and keys;

    o. post office box and private mail box records;

    p. equipment rental records and other lease and rental agreements;

    q. transportation records, including but not limited to, accounts, bills, receipts and invoices, bills of lading, airway bills, freight bills, air cargo bills, dispatch records, logs, manifests, shipping documents, and invoices;

    r. credit applications, credit card statements and receipts;

    s. paper tickets, notes, schedules, receipts, and other items relating to travel;

    t. cellular phones, cellular and landline telephone statements and records;

9. Any other records that identify customers, suppliers, associates, partners, and/or co-conspirators, including, but not limited to: contracts, address books, telephone books, rolodexes, telephones, pagers, or personal digital assistants with stored telephone information, notes reflecting telephone and pager numbers, photographs (to include still photos, negatives, movies, slides, and video tapes), and recordings of conversations, including those made over telephone answering machines and voicemail systems.

10. Identification documents, to include driver's licenses, passports, visas or similar documents and representative exemplars or original handwriting samples.

11. Papers, tickets, notes, receipts, and other documents or items relating to domestic and international travel.

12. Indicia of occupancy, residency, and/or ownership of any premises, property and/or vehicles, including keys, photographs, or documents.

13. Documents showing custody and control of the vehicle where evidence was seized, including, but not limited to, utility and other bills, driver's licenses, passports, visas and other handwritten notes or other correspondence.

14. Photographs, including still photos, negatives, video tapes, films, undeveloped film and the contents therein, slides, in particular photographs of co-conspirators, or assets.

15. All telephone records, toll records and billing statements for the Subject Residence and any other business entities associated with or related to it.

16. All records relating to any shipments received or sent through U.S. Postal Service, Federal Express, UPS or other carrier service, including account statements and shipping invoices.

17. All TJX documents, TJX property, any gift cards and or blank stock cards.